**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA DENEANE NIX, o/b/o/ LLW,** | ) | **CASE NO. 1:10CV0667** |
| **Plaintiff,** | ) | |
| **v.** | ) | **MAGISTRATE JUDGE GREG WHITE** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | **MEMORANDUM OPINION & ORDER** |

Plaintiff, Lisa Deneane Nix ("Nix"), *pro se*, on behalf of her daughter, LLW, challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying the claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381, 20 C.F.R. § 416.924a. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the decision of the Commissioner is affirmed.

**I. Procedural History**

On November 20, 2006, Nix, through counsel, filed an application for SSI benefits on behalf of LLW, an older infant, due to seizure disorder and speech/language delay. The application was denied both initially and upon reconsideration. Nix timely requested an administrative hearing.

On September 15, 2009, a hearing was held before an Administrative Law Judge ("ALJ"). LLW was represented by counsel at the hearing. On October 16, 2009, the ALJ found that LLW did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled an impairment listed in Appendix 1. He concluded, therefore,

that LLW was not under a disability. (Doc. No. 11-2 at 12-18.)

## II. Evidence

As of the hearing date, September 15, 2009, LLW was four years old and was soon to start preschool. (Tr. 24, 29.)

In March 2005, when LLW was nine days old, she experienced seizures and was taken to the hospital. (Tr. 207.) An MRI revealed a brain hematoma (ruptured blood vessel). (Tr. 247, 337-338.) She was placed on phenobarbital. (Tr. 208.)

Throughout 2005, LLW visited the pediatric neurology clinic for seizure management and pediatric care. (Tr. 148-197; 283-291.) After LLW's condition stabilized, on September 26, 2005, the pediatric neurologist began weaning LLW from the phenobarbital. (Tr. 150-151.) In March 2006, at LLW's one-year checkup, Hossam H. Abdelsalam, M.D., a pediatric neurology fellow, noted that LLW "remained seizure free . . . off phenobarbital." (Tr. 148-149.) Neil R. Friedman, M.D., affirmed the report. (Tr. 149.)

In November 2006, LLW had another seizure episode during sleep. (Tr. 255, 358.) A CT scan showed no new hemorrhage. (Tr. 264, 334.) Jena Khera, M.D., a pediatric neurology fellow, concluded that LLW experienced "recurrence of left focal seizures" and sleep myoclonus (Tr. 323), and prescribed Trileptal. (Tr. 324.) Gary Hsich, M.D., affirmed Dr. Khera's conclusions. *Id*.

In January 2007, Malika Haque, M.D., a state agency physician, upon reviewing LLW's medical records, assessed she had less-than-marked limitations in the domain of health and physical well-being, and no limitations regarding acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for herself. (Tr. 265-270.)

In February 2007, a daycare teacher at Richmond Heights Academy reported that LLW's right leg stiffened, causing her to fall. (Tr. 107-108.) The teacher noted that LLW relaxed, got up, and continued playing. (Tr. 108.) Subsequently, Nix took LLW to the doctor's office. (Tr. 327-331.) LLW's exam was normal, and Dr. Khera was unable to determine the cause of her leg-stiffening episodes, but stated that "they do not seem serious nor do they significantly

2

interfere with her function." (Tr. 330.) The doctor stated that it is not surprising for a two-year old to occasionally fall. (Tr. 330.)

In April 2007, LLW had another seizure and was taken to the hospital. (Tr. 326.) The doctors reported it as sleep jerking. (Tr. 326.) After spending two nights in the Epilepsy Monitoring Unit, no epileptic correlation was found, and LLW was discharged with medication. *Id.* The following month, LLW experienced another isolated episode. (Tr. 321.) Again, the doctors found no abnormalities and further opined that LLW's issues with falling or leg-stiffening were not serious. (Tr. 324.)

In August 2007, John Mormol, M.D., a state agency physician, reviewed the medical evidence and affirmed Dr. Haque's evaluation that LLW had less-than-marked limitations in the domain of health and physical well-being and no other limitations. (Tr. 294-295.)

In December 2007, at a follow-up visit with Dr. Hsich and pediatric neurology fellow, Ninon Pachikara, M.D., Nix requested a letter from the doctors to the gas company regarding LLW's medical condition to avoid discontinued gas service due to nonpayment, as well as a prescription for a handicapped parking placard. (Tr. 317-319.) Both requests were refused as the doctors found that LLW's current condition, along with her normal development and exam results, did not warrant such medical entitlements. *Id*.

In March and August 2008, LLW again experienced seizures. Her exams and testing were normal and LLW continued taking medication. (Tr. 308-315.)

In June 2009, Sarah Miller, a speech pathologist evaluating LLW, found she had a mild speech impairment, mild expressive language impairment, and moderate impairment of language comprehension. (Tr. 303.) She recommended speech therapy for articulation and language development issues and LLW was placed on a waiting list at a speech center. (Tr. 304.) Ms. Miller concluded that LLW's prognosis was good. *Id*.

**Hearing Testimony**

At the hearing on September 15, 2009, Nix testified to the following:

- LLW's first seizure was in March 2005, when she was nine days old and her last seizure was in March 2008. (Tr. 25, 26.) As an infant she was prescribed Phenobarbital, and is currently taking Trileptal. *Id.*

- LLW was at Richmond Heights Academy, a daycare, from age two months to approximately 2-1/2 to 3 years. (Tr. 27.)

- LLW was to begin preschool shortly after the hearing date. (Tr. 29.)

- She is able to tell her mother when she needs food and water. (Tr. 29-30.)

- She met her developmental milestones, such as walking and crawling, "on time." (Tr. 30.) As far as her relationship with friends, a teacher told Nix that LLW gets a "little physical" with her classmates. (Tr. 31.)

- She loves to play "housekeeping" and with dolls. (Tr. 30.)

- She has two friends that she plays with often, one from church and one from the daycare. (Tr. 30-31.)

- She has no problem moving, playing or walking. (Tr. 31-32.)

### III. Standard for Disability

To qualify for SSI benefits, an individual must demonstrate a disability as defined under the Act. "An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listings, the Commissioner will assess the functional limitations caused by the impairment. 20 C.F.R. § 416.926a(a). The Commissioner will consider how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [ ]self; and (6) health and

4

physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled. 20 C.F.R. § 416.926a(d). To receive SSI benefits, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning. 20 C.F.R. § 416.926a(e)(2)(i). "Marked" limitation means "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id*.

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation means "more than marked." 20 C.F.R. § 416.926a(e)(3)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id*.

If an impairment is found to meet, or qualify as the medical or functional equivalent to a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled. 20 C.F.R. § 416.924(d)(1).

### IV. Summary of Commissioner's Decision

The ALJ found LLW established medically determinable severe impairments due to seizure disorder and speech/language delay; however, her impairments or combination of impairments did not meet or medically or functionally equal one of the listings. (Tr. 12.) The ALJ concluded that LLW had not been under a disability at any time since November 20, 2006. (Tr. 18.)

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed

5

if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001)(*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

Nix's Brief on the Merits, submitted *pro se*, does not set forth clearly recognizable assignments of errors. However, it is well settled that "inartfully pleaded allegations in a *pro se* complaint are held to less stringent standards than formal pleadings drafted by lawyers."

*Franklin v. Rose*, 765 F.2d 82, 84-85 (6th Cir. 1985) (internal quotation marks omitted) (*citing Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Further, allegations in *pro se* pleadings are entitled to "liberal construction" which sometimes requires "active interpretation . . . to encompass any allegation stating federal relief." *Id*. As such, the Court construes Nix's brief as raising two assignments of error: (1) whether the ALJ's finding that LLW's impairments did not meet or medically equal Listing 111.00 is unsupported by substantial evidence; and, (2) whether the ALJ's finding that LLW's impairments did not functionally equal Listing 111.00 is unsupported by substantial evidence.

### Listing 111.00

Nix argues that contrary to the ALJ's finding, LLW's seizures are not controlled. (Doc. No. 13 at 1.) She contends that because LLW continues to have seizures, she meets Listing 111.00 as to epilepsy. *Id*. She further contends that LLW's speech delay and attention problems also fall under this Listing. *Id*. The Commissioner responds that substantial evidence supports the ALJ's conclusion that LLW did not have "uncontrolled seizures or other neurological abnormalities" that met or equaled listing requirements related to seizure disorders. (Doc. No. 21 at 7.)

Listing 111.00 Neurological, states, in pertinent part, as follows:

> A. *Convulsive epilepsy* must be substantiated by at least one detailed description of a typical seizure. Report of recent documentation should include a neurological examination with frequency of episodes and any associated phenomena substantiated.
>
> Young children may have convulsions in association with febrile illnesses. Proper use of 111.02 and 111.03 requires that epilepsy be established. Although this does not exclude consideration of seizures occurring during febrile illnesses, it does require documentation of seizures during nonfebrile periods.
>
> There is an expected delay in control of epilepsy when treatment is started, particularly when changes in the treatment regimen are necessary. Therefore, an epileptic disorder should not be considered to meet the requirements of 111.02 or 111.03 unless it is shown that convulsive episodes have persisted more than three months after prescribed therapy began.
>
> B. *Nonconvulsive epilepsy*. Classical petit mal seizures must be documented by characteristic EEG pattern, plus information as to age at onset and frequency of clinical seizures.
>
> C. *Motor Dysfunction*. As described in 111.06, motor dysfunction may

be due to any neurological disorder. It may be due to static or progressive conditions involving any area of the nervous system and producing any type of neurological impairment. This may include weakness, spasticity, lack of coordination, ataxia, tremor, athetosis, or sensory loss. Documentation of motor dysfunction must include neurologic findings and description of type of neurologic abnormality (e.g., spasticity, weakness), as well as a description of the child's functional impairment (i.e., what the child is unable to do because of the abnormality). Where a diagnosis has been made, evidence should be included for substantiation of the diagnosis (e.g., blood chemistries and muscle biopsy reports), wherever applicable.

D. *Impairment of communication*. The documentation should include a description of a recent comprehensive evaluation, including all areas of affective and effective communication, performed by a qualified professional.

The ALJ found that LLW "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.924, 416.925 and 416.926). Specifically, the claimant does not have uncontrolled seizures or other neurological abnormalities that meet or medically equal Listings requirements." (Tr. 12.) The ALJ supported his conclusion based on the following evidence:

> In terms of the claimant's alleged seizure disorder, the records from the Cleveland Clinic document the claimant's history of seizures that began at nine days of age, which was undoubtedly a stressful and emotionally straining experience for the mother. Diagnostic studies establish that these seizures originated from the right parietal region, with CT scan and MRA scan showing bilateral subdural fluid collections, right parietal subdural nematoma, parenchymal hemorrhage involving the medial parietal cortex, and hemorrhagic contusions of the posterior parietal region and parietal operculum (Exhibits 1F, 2F and 9F, pp. 4-5). However, the claimant's seizures attenuated by July 2005, with CT scan and MRA scan demonstrating resolution of the parenchymal edema and extra-axial fluid in the posterior interhemisphere fissure. Additionally, repeat electroencephalograms were normal, and the claimant's Phenobarbital was stopped by October 2005 because her condition had stabilized (Exhibit 1F). The claimant subsequently experienced minor motor breakthrough seizures, although an evaluation of multi-focal jerks that occurred in November 2006 during sleep resulted in the conclusion that the claimant was exhibiting sleep myoclonus rather than seizure activity (Exhibits 3F, 9F and 10F). At this point the claimant was prescribed Trileptal, with only minor seizure breakthrough activity in April and May of 2007 and in March and August of 2008 (Exhibit 9F). The claimant's mother's report that the claimant falls on occasion was not deemed to represent seizure activity by the claimant's physician, who noted immediate recovery from the falls with no sequelae, and indicated that it was not surprising for a young child to fall at least once per day (Exhibit 9F, pp. 17-29). No seizures have occurred since August 2008.
>
> Additionally, records from Heather Arnett, M.D., of Kids First Pediatrics, include essentially normal clinical examination findings and establish that the claimant is attaining normal developmental milestones (Exhibit 5F). Significantly, the claimant's mother's request for a handicapped parking placard because of the claimant's condition was denied (Exhibit 11F). Furthermore, a speech and

8

> language evaluation resulted in the conclusion that the claimant has a good prognosis for age-appropriate speech and language skills (Exhibits 8F and 12F).

(Tr. 13-14.) The ALJ reviewed LLW's seizure history, noting that LLW's seizures were not epileptic episodes, but were sleep myoclonus, including the minor seizure breakthroughs in April and May of 2007 and March and August of 2008. He further noted that LLW's doctors concluded that her leg-stiffening and falling episodes were not unusual for a two year old. Nix has not pointed to any evidence showing the LLW's seizure disorders were uncontrolled or more severe than the record indicates.

Nix now claims that LLW had a seizure on March 11, 2010, after the ALJ's decision dated October 2009. (Doc. No. 13 at 2.) The record, however, contains no evidence of this seizure, and Nix did not file any documentation supporting it. Furthermore, even if it did occur, the seizure took place after the administrative hearing and the ALJ's decision. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (Evidence submitted "after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review.") The 2010 seizure is not material as there is not "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). If LLW's condition deteriorated subsequent to the ALJ's decision in October 2009, "the appropriate remedy would have been to initiate a new claim for benefits as of the date that the condition aggravated to the point of constituting a disabling impairment." *Id.* at 712 (*citing Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)); *see also Jones v. Comm'r of Social Sec.*, 2008 WL 4403821, *10 (E.D. Mich. Sept. 25, 2008).

Nix also claims that LLW met or medically equaled a listing due to speech delay problems. (Doc. No. 13 at 1.) She points out that LLW's peers make fun of the way she talks. *Id.* Nix, however, has presented no evidence that LLW's speech delay rose to the level required to meet or medically equal a listing. The ALJ relied upon the speech pathologist's conclusion that LLW had a good prognosis for age-appropriate speech and language skills.

9

**Functionally Equaling a Listing**

Nix further claims that LLW was "recently diagnosed by a state doctor that stated 'she has attention problems along with learning delays and she's very hyper.'" (Doc. No. 13 at 1.) Nix argues that LLW functionally equals a listing as she has a marked limitation in the domain of health and physical well-being. She also argues that the ALJ did not take into consideration her speech delay and her attention problems, which cause learning delays. *Id*.

In the domain of health and physical well-being, the Regulations require the Commissioner to consider the "cumulative physical effects of physical or mental impairments and their associated treatments or therapies on a claimant's functioning. When a claimant's physical and/or mental impairments have physical effects that cause 'extreme' limitation in a claimant's functioning, a claimant will generally have an impairment(s) that 'meets' or 'medically equals' a listing." 20 C.F.R. § 416.926a(l).

The ALJ noted that the record contained no medical opinion that LLW is disabled. (Tr. 14.) He then determined that LLW did not functionally equal a listing, finding less-than-marked limitations with respect to the "interacting and relating with others" and "health and physical well-being" domains and no limitations at all in the other four domains. (Tr. 14-18.) As to the domain of health and physical well-being, the ALJ noted: "Specifically, the claimant's history of seizures that have attenuated do impact her overall health, but not to a level of severity that would preclude her from functioning independently, appropriately and effectively in an age-appropriate manner." (Tr. 18.)

Even though the ALJ did not specifically mention the state agency reviewing doctors opinions, he clearly relied on them. Drs. Haque and Mormol both concluded that LLW's impairments were severe, but that they did not meet, equal, or functionally equal a listing. (Tr. 265, 292.) Furthermore, both doctors found no limitations, other than a less-than-marked limitation in the health and physical well-being domain. Still, the ALJ went further, concluding

that LLW also had less-than-marked limitations in interacting and relating with others.[1] (Tr. 16.) The ALJ explained, however, that there was "no evidence of severe behavioral problems, emotional difficulties or other indications of social maladjustment that would preclude her from interacting appropriately with peers and adults." *Id.*

Substantial evidence supports the ALJ's conclusion that LLW was not under a disability at any time since November 20, 2006.

### VII. Decision

For the foregoing reasons, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

                                         s/ Greg White
                                        United States Magistrate Judge

Date: December 14, 2010

---

[1] In the domain of interacting and relating with others, the Regulations require the Commissioner to consider how well the claimant initiates and sustains emotional connections with others, develops and uses the language of her community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of others' possessions. 20 C.F.R. § 416.926a(i). The Regulations also provide age-specific functions for this domain as follows:

> (iii) Preschool children (age 3 to attainment of age 6). At this age, you should be able to socialize with children as well as adults. You should begin to prefer playmates your own age and start to develop friendships with children who are your age. You should be able to use words instead of actions to express yourself, and also be better able to share, show affection, and offer to help. You should be able to relate to caregivers with increasing independence, choose your own friends, and play cooperatively with other children, one-at-a-time or in a group, without continual adult supervision. You should be able to initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand what you say most of the time.

20C.F.R. § 416.926a(i)(2)(iii).